# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 8, 2005          Decided November 15, 2005

No. 04-7181

ANGELA R. JONES,
APPELLANT

v.

DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS, ET
AL., *A/K/A* DISTRICT OF COLUMBIA DEPARTMENT OF
CORRECTIONS,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 00cv02140)

---

*John F. Karl, Jr.* argued the cause for appellant. With him
on the briefs was *Jonathan Halperin*.

*David A. Hyden*, Assistant Attorney General, argued the
cause for appellees. With him on the brief were *Robert J.
Spagnoletti*, Attorney General for the District of Columbia, and
*Edward E. Schwab*, Deputy Attorney General.

Before: GINSBURG, *Chief Judge*, and TATEL and BROWN,
*Circuit Judges*.

2

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: Appellant Angela R. Jones brought this action against her employer, the District of Columbia Department of Corrections ("Department"), and various individuals, alleging sexual harassment, retaliation, and several common law claims. The district court granted summary judgment against Jones as to all causes of action and denied Jones's motion for leave to amend her complaint. We reverse the judgment of the district court as to Jones's sexual harassment cause of action. We also reverse the order of the district court denying Jones leave to amend her complaint.

I

In September 1997, Jones began work as a correctional officer at the Department's Occoquan prison facility. Sergeant Darryl Ellison supervised one of the zones in which Jones worked. Jones claims Ellison's statements and conduct gave rise to a hostile work environment and the Department retaliated against her after she submitted harassment complaints against Ellison. Jones's allegations focus on three primary incidents. First, in December 1997 or January 1998, Jones sought to retrieve an umbrella she had left in a gymnasium at the prison facility. Ellison allegedly went into the gym with Jones, shut the door, and told Jones, "I want to kiss you." He also allegedly grabbed her, pulled her toward him, and held her face, telling her she was "sexy" and commenting about her lips. Second, in early 1998, Ellison allegedly called Jones into his office for a work evaluation and told her he wanted to kiss her. He also commented about her breasts and panty line. Third, in early 1998, Ellison allegedly approached Jones in the mess hall, commented about Jones's breasts and panty line, and brushed himself up against Jones "[w]ith his whole body." Jones also alleges Ellison made several other inappropriate comments

including bragging about his sexual prowess, publicizing his desire to have sex with her, telling colleagues that she was gay, threatening to give her a poor evaluation or to begin disciplinary action against her, and calling her a "red bitch." Jones further alleges Ellison and several other male employees at the Department had a bet as to which of them would be the first to have sex with Jones.

Jones asserts that, after the gym incident, she reported Ellison's behavior to a Sergeant Armstrong, who said he would talk to Ellison, but the harassment continued nonetheless. On April 9, 1998, Jones filed an internal harassment complaint against Ellison with senior-level officers at the Department. Jones's written complaint discussed only the gym incident in specific detail. The warden immediately issued cease-and-desist orders to both Jones and Ellison, instructing them to "avoid unnecessary contact." Department personnel then conducted an investigation, taking recorded statements from fourteen witnesses and issuing a thirty-one-page investigation report. The report's summary noted that several witnesses had denied or contradicted Jones's allegations and concluded there was "insufficient evidence to support a finding of Probable Cause." Jones, however, alleges the investigation was perfunctory and biased.

In support of her retaliation claim, Jones asserts that she was transferred to the night shift "[a]lmost immediately" after filing her internal harassment complaint. According to the Department's investigatory report, however, this shift change applied to all probationary officers on Jones's shift, and the "shift change roster" was completed and approved seventeen days *before* Jones's harassment complaint. Also, Jones had been informed she would have to work all three shifts during her probationary period. In further support of her claim, Jones states she asked, in August 1998, to return to the day shift, and though

the Department eventually granted her request, it changed her duty location and days off over the course of the subsequent six weeks.  Then, on October 15, 1998, the Department assigned Jones to the "tower" and barred her from entering the main prison institution.  This new assignment came two-and-a-half months after Jones filed a harassment complaint with the Equal Employment Opportunity Commission ("EEOC").  Jones asserts she was initially assigned to Ellison's zone in the tower.  She also states the tower was cold in the winter, hot in the summer, "infested with bugs and had inadequate bathroom facilities."  Colleagues told Jones she was being "punished."  She worked in the tower for ten months, at which point the Occoquan prison facility was closed.  She concedes, however, that the tower assignment was one of the three normal assignments for an officer in Jones's position and that she worked the day shift in the tower, as she had requested.  Jones further states that, on December 19, 1998, when she asked to take time off after the murder of her cousin, the Department sought verification of her claim that her cousin had been murdered.  As a result, she became so emotionally upset that she did not attend the funeral.

Jones received a notice of right to sue on June 8, 2000, and brought this action in the district court on September 6, 2000.  Her amended complaint alleges causes of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the District of Columbia Human Rights Act, D.C. CODE § 2-1401 *et seq.* (2001); and the common law.  After close of discovery, the Department and the individual defendants moved for summary judgment on all causes of action.  Jones opposed the motion, in part, and also moved to amend her complaint to include claims under 42 U.S.C. § 1983.  On September 30, 2004, the trial court denied leave to amend and granted summary judgment.  Among other things, the trial court found the Department had satisfied the requirements of the *Faragher-Ellerth* defense to Jones's Title VII sexual harassment claim and Jones had failed to make

a sufficient showing to defeat summary judgment on her retaliation claim. Jones now appeals the trial court's summary judgment order with regard to her Title VII sexual harassment and retaliation claims against the Department, along with the trial court's denial of her motion for leave to amend her complaint.

II

In *Faragher v. Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), the Supreme Court delineated the circumstances in which an employer may be held vicariously liable for a supervisor's harassment of a subordinate. If the harassment takes the form of a tangible employment action—that is, a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," *Ellerth*, 524 U.S. at 761—then the supervisor has unquestionably exercised authority on behalf of the employing enterprise in furtherance of the harassment, and the employer is therefore liable. *See id.* at 760-62; *Faragher*, 524 U.S. at 790-91. Vicarious liability is less certain, however, where the harassment does not result in a change in status amounting to a tangible employment action. In such cases, "a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807 (citation omitted).

Here, Jones has not demonstrated a tangible employment

action. Because the tangible employment action establishes the requisite link between a supervisor's injurious conduct in the workplace and the employing enterprise, it must be an action *done by the supervisor whose conduct has generated the employee's claim. Ellerth*, 524 U.S. at 760-63. Jones cites the changes in her work schedule, her assignment to the tower, and the Department's efforts to verify the murder of her cousin, but even assuming such actions constituted a "significant change in [her] employment status," *id*. at 761, Jones has presented no evidence that Ellison was responsible for any of these actions. Accordingly, we conclude that the *Faragher-Ellerth* defense is available to the Department.

However, the *Faragher-Ellerth* defense is explicitly an "affirmative defense" as to which the employer has the burden of proof. *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807. Federal Rule of Civil Procedure 8(c) states: "In pleading to a preceding pleading, a party shall set forth affirmatively . . . any . . . matter constituting an . . . affirmative defense." In *Harris v. Secretary, United States Department of Veterans Affairs*, 126 F.3d 339 (D.C. Cir. 1997), we construed Rule 8(c) strictly:

> In order to preserve the notice purpose of Rule 8(c) and the discretionary structure of Rule 15(a), we hold that Rule 8(c) means what it says: a party must first raise its affirmative defenses in a responsive pleading before it can raise them in a dispositive motion. . . .
> There is no reason to fear that procedural formalism will displace substantive justice here, because a party may request, and the District Court shall freely give, leave to amend the pleadings under Rule 15(a) when justice requires.

*Id*. at 345.

Here, the Department concedes that it failed to raise the *Faragher-Ellerth* defense in its answer to the amended complaint, and it presents this court with no argument as to why our holding in *Harris* should not apply, arguing instead that Jones suffered no prejudice from its failure to plead the defense. However, in *Harris*, we were very clear that lack of prejudice is not determinative: "On its face and on its logic, Rule 8(c) requires that a party actually plead its affirmative defenses, not that it plead them only in those cases where failure to plead would result in prejudice to the opposing party." *Id*. At oral argument, counsel for the Department asserted Jones had forfeited any objection to the Department's failure to plead the *Faragher-Ellerth* defense by not having raised this objection in the district court, but the Department was equally dilatory for waiting until oral argument to raise the forfeiture argument. If the Department had raised the forfeiture argument in its brief on appeal, Jones might have been able to show that her Rule 8(c) objection was in fact raised in the district court, perhaps during oral proceedings. Accordingly, we cannot credit the Department's belated argument that Jones forfeited this objection. We conclude the district court erred in granting summary judgment based on the *Faragher-Ellerth* defense in a case in which the defense had not been raised in the pleadings. As described in *Harris*, the Department may move to amend its answer on remand. If the trial court permits the amendment, then the Department may renew its motion for summary judgment or attempt to prove the elements of its *Faragher-Ellerth* defense at trial.

## III

The district court also granted summary judgment in favor of the Department on Jones's retaliation claim. In support of her retaliation claim, Jones asserts that, after she complained of sexual harassment, Ellison verbally harassed her and the

Department changed her work shift, transferred her to the assignment in the tower, and refused to allow her time off to attend her cousin's funeral. Having engaged in virtually no discovery, however, Jones relies only on her own affidavit to support these allegations.

Jones is not specific about the verbal harassment she suffered after complaining of sexual harassment. She may be referring to Ellison's alleged reference to her as a "red bitch." The evidence on this point is conflicting. The Department's investigation report relates Jones's statement that Ellison made this comment shortly after Jones submitted her internal sexual harassment complaint. However, Jones's sworn response to interrogatories places this incident in March 1998, a month *before* she submitted her harassment complaint, and in her deposition, Jones described hearing the comment *immediately before* she submitted her harassment complaint. This conflict in the evidence does not affect our conclusion, however. Even if the comment came after Jones submitted her complaint, it was an isolated insult that does not constitute the sort of adverse action that can support a retaliation claim. *See Faragher*, 524 U.S. at 787-88; *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000); *see also Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005) (stating that the adverse employment action supporting a retaliation claim must be material).

Jones also claims retaliation based on the changes in her work shift. She focuses in particular on her transfer from the second shift to the third shift shortly after she submitted her harassment complaint. However, the Department's investigation report indicates this transfer applied to all probationary officers on the second shift, and the shift change roster was completed and approved seventeen days before Jones submitted her harassment complaint. Moreover, Jones had earlier been informed she would have to work all three shifts during her

probationary period. Jones does not contradict these assertions, arguing only that the Department has not produced the shift change roster. We find the Department's showing on this point sufficient to require Jones to present some evidence that she was singled out for adverse treatment. As for other alleged shift changes, Jones's claim is not specific. Jones admitted in her declaration that one of these shift changes was at her request; she sought to return to the day shift in August 1998, and the Department granted her request. Jones, however, complains the Department changed her duty locations and days off over the subsequent six weeks. Jones claims these unspecified changes caused her some temporary inconvenience, but she gives us no basis for concluding that these changes were retaliatory, rather than merely a consequence of the Department's effort to accommodate her request to return to the day shift. Her allegations in this regard are simply too vague to support her retaliation claim.

Jones next argues her transfer to the tower was retaliatory, coming as it did just two-and-a-half months after she filed her complaint with the EEOC. A lateral transfer, without more, does not constitute an adverse employment action sufficient to establish a prima facie case of retaliation. As we have previously explained:

> The clear trend of authority . . . is to hold that a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A survey of the relevant case law shows that the authority requiring a clear showing of adversity in employee transfer decisions is both wide and deep.

*Brown v. Brody*, 199 F.3d 446, 455-56 (D.C. Cir. 1999) (internal quotation marks and citations omitted). Accordingly, we have

held:

> [A] plaintiff who is made to undertake . . . a lateral transfer—that is, one in which she suffers no diminution in pay or benefits—does not suffer an actionable injury unless there are some other *materially adverse consequences* affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm. *Mere idiosyncracies of personal preference are not sufficient to state an injury*.

*Id.* at 457 (emphases added). In short, there are few circumstances in which a mere lateral transfer can rise to the level of an adverse employment action, and we have expressly rejected a subjective test in this context. *See, e.g., Stewart v. Ashcroft*, 352 F.3d 422 (D.C. Cir. 2003) (employee was passed over for position as section chief); *Freedman v. MCI Telecomms. Corp.*, 255 F.3d 840 (D.C. Cir. 2001) (employee was transferred from day shift to night shift, interfering with his education).

Jones's evidence, viewed in the light most favorable to her, establishes several reasons the tower assignment was undesirable. Though other assignments at the Occoquan facility may have had their own idiosyncratic disadvantages, a jury could reasonably infer from Jones's evidence that the tower assignment was generally less favorable than other assignments. But that fact, if true, does not make the assignment an adverse employment action. Jones readily concedes the tower was one of the three possible assignments that might arise in the ordinary course of her employment, and therefore there was no "material" change in "the terms, conditions, or privileges of her employment" when she was assigned to the tower. *Brown*, 199

F.3d at 457. Neither a routine shift change nor a routine reassignment that was part of a probationary employee's ordinary training can be deemed an adverse employment action. Although it is conceivable that an employee might allege specific facts demonstrating that a seemingly routine reassignment was in fact retaliatory, Jones does not allege such facts in the present case, and therefore we need not consider the issue.

Jones argues the retaliatory nature of the tower assignment is evident from the permanency of that assignment, which lasted ten months and ended only after the District of Columbia closed the prison facility. But we have no way of determining the relevance of the duration of her tower assignment without information about the *typical* duration of assignments for probationary officers. Jones offers no evidence on this matter nor even alleges she spent an unusually long time on tower duty as compared to other officers, and as such, her retaliation claim must fail. Moreover, even if the eventual duration of her tower duty significantly exceeded the norm, it could only be considered retaliatory *at that point*, if ever, because Jones does not allege that the duration of the assignment was fixed at the outset. Therefore, she cannot rely on the temporal proximity between the initial assignment and the filing of her EEOC complaint to establish a prima facie case of retaliatory motive. *See, e.g.*, *Cones*, 199 F.3d at 521; *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985).

Finally, Jones argues the Department retaliated against her when it made efforts to verify her claim that her cousin had been murdered. However, Jones does not allege this procedure was contrary to standard Department practice under the circumstances, and in any case, we do not think it rises to the level of an adverse employment action that can support a claim of retaliation. Jones's evidence does not indicate that the

Department actually refused to give her time off, but only that it sought verification. An effort to verify an employee's statements, without more, is not an adverse employment action. Jones alleges she became so "stressed" as a result of the Department's actions that she was unable to attend her cousin's funeral, but her subjective response is not relevant. *See Brown*, 199 F.3d at 457; *see also Fairbrother v. Morrison*, 412 F.3d 39, 56 (2d Cir. 2005).

In conclusion, we are not persuaded the district court erred in granting summary judgment on Jones's retaliation claim.

IV

The district court denied Jones's motion for leave to amend her complaint. Doing so without stating reasons was an abuse of discretion. *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996). Accordingly, the district court should reconsider the motion on remand.

V

We affirm the judgment of the district court except as to Jones's cause of action against the Department for sexual harassment in violation of Title VII. As to that cause of action, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion. We also reverse the district court's order denying Jones's motion for leave to amend her complaint.

*So ordered.*