WILLIAMS, Senior Circuit Judge,
dissenting:
My colleagues appear to address the contentions of the defendant Department of Housing and Urban Development with what one might call a “magic words” approach, reminiscent of the old writ system. They quote a passage from HUD’s brief in district court, making what seems like a clear argument, and then declare that it “says nothing about” the only topic it discusses. Maj. Op. at 614. This enables the majority to apply a notion of “adverse action” for purposes of retaliation claims under Title VII that is both unprecedented and entirely unjustified by reference to the text, purpose, or normal operation of the statute.
In its papers before the district court, HUD took a prosaic, obvious, almost inevitable position on the proper baseline for resolving whether plaintiff Pardo-Kronemann’s allegedly retaliatory reassignment was an “adverse action.” It advocated simply comparing his new position with the one he held at the time of the reassignment in January 2002:
Plaintiff alleges that the reassignment was an adverse action because it resulted in a change in his duties as an attorney. (“... Plaintiff was reassigned from his position as an attorney within OGC [Office of General Counsel] to his current position as a de facto program analyst.” See Comp. ¶ 25.) The record reflects that from March until December 2001, Plaintiff had no job description and it is unclear to whom exactly he was to *613 have been reporting substantively. See Weidenfeller Declaration, Exh. 11. He was performing no work for OGC, but OGC maintained his time and attendance records. Id. ¶ 7. At a management meeting, it became clear that plaintiff was not performing any work for the office of the Secretary after his return from [a position at the Inter-American Development Bank to which he had been “detailed” for a period of HUD-paid work]. Id. ¶ 8.
Def.’s Mem. in Supp. of Mot. for Summ. J. 7, Joint Appendix (“J.A.”) 1465 (emphasis in original).
The passage seems perfectly plain. The first sentence sets out what the brief writer perceives to be plaintiffs adverse action claim (namely, that the reassignment produced a “change in his duties”), and the second, third and fourth sentences point to what plaintiff was actually doing at the time of the reassignment — specifically, no work for the Office of General Counsel, and indeed not much else. I cannot grasp how this can be characterized as saying “nothing about which pre-transfer duties provide the relevant baseline.” See Maj. Op. at 609.
To understand the parties’ positions, as well as the majority’s view, it’s helpful to step back and briefly consider the chronology of events concluding in Pardo-Kronemann’s allegedly retaliatory transfer:
Sometime in 1998: Pardo-Kronemann is assigned to the Program Compliance Division of HUD’s Office of General Counsel (“OGC”).
April 1999: Pardo-Kronemann files the last of several complaints of discrimination or retaliation.
November 1999: Pardo-Kronemann is “detailed” to the Inter-American Development Bank (“IDB” or “the Bank”) for six months, at his request. During his time there, ultimately extended until November 2000, he works on a handbook for creation of primary and secondary mortgage markets in developing nations.
November 2000: Pardo-Kronemann seeks and is granted unpaid leave from HUD; he continues to work on the handbook.
March 2001: Pardo-Kronemann returns to HUD, where he is nominally assigned to OGC but is physically in the Office of the Secretary. He continues to work on the handbook, as well as on the issue of how HUD could be more effective in the international arena; he does no standard OGC legal work.
June 2001: Discussions allegedly begin among higher-level persons at HUD regarding possible assignment of Pardo-Kronemann to HUD’s Office of International Affairs (“OIA”).
October 15, 2001: Papers are executed for reassignment of Pardo-Kronemann to OLA — the action that he challenges as retaliatory.
October 31, 2001: Pardo-Kronemann turns in the handbook and, for the first time so far as the record discloses, states that he “would welcome legal assignments.”
The majority does not assess “adverse action” by reference to the benchmark claimed by HUD (i.e., Pardo-Kronemann’s role at the agency in 2001, before his assignment to OIA). Instead, it looks to the OGC job that Pardo-Kronemann occupied from 1998 until November 1999, and which he relinquished of his oim volition more than two years before the challenged transfer. See Maj. Op. at 607.
In defense of this surprising view, the majority insists it is doing nothing more than acquiescing in HUD’s own interpretation of how Title VII’s retaliation provision applies to the facts of this case — however contrary to the agency’s interest that interpretation may be. Maj. Op. at 607. *614 But the majority is factually wrong: HUD cannot remotely be said to have tied its fate to the position the majority ascribes to it, let alone to have done so sufficiently unambiguously to justify our departing from the law in deference to a senseless alternative.
The passage I’ve quoted at length above clearly treats the “adverse action” inquiry as turning on differences between Pardo-Kronemann’s new job and the one he was doing when he was transferred. My colleagues disagree. In their view,
this passage merely recites the facts and summarizes Pardo-Kronemann’s claim as a general matter — that the transfer from OGC to OIA had a negative impact on his duties as an attorney. The paragraph says nothing about which pretransfer duties provide the relevant baseline....
Maj. Op. at 609-10. Nothing? The paragraph, like most legal arguments, begins by referencing a legal standard: “Plaintiff alleges that the reassignment was an adverse action because it resulted in a change in his duties.” Def.’s Mem. in Supp. of Mot. for Summ. J. 7, J.A. 1465 (emphasis in original). Then it offers facts that are obviously selected to show that the legal standard cannot possibly be satisfied: “The record reflects that from March until December 2001, Plaintiff had no job description.... He was performing no work for OGC.... Plaintiff was not performing any work for the office of the Secretary.” Id.
The meaning of these words seems inescapable. The defendant is saying that Pardo-Kronemann can’t be said to have suffered an adverse action, because an adverse action requires adversity compared with some baseline, and the proper baseline in Pardo-Kronemann’s case was the position he occupied “from March until December 2001,” in which he did “no work.”
As it happens, Pardo-Kronemann never took issue with that formulation. Rather, he fudged the matter, at best implicitly adopting the position that the majority now imputes to HUD, namely that the proper baseline is his work at OGC before November 1999, when he was “detailed” to the IDB at his request. He pointed to “his prior position as an attorney in OGC,” Pl.’s Mem. in Opp. to Mot. for Summ. J. 6, J.A. 1006, and went on to disparage the job in OIA as possibly not even being “a bona fide legal position,” id. Given the disparagement, his OGC reference is likely intended to allude to the pre-November 1999 era when he was apparently doing conventional OGC work. In response, HUD reasserted its view that the proper benchmark was Pardo-Kronemann’s position at the time of reassignment:
Plaintiff was placed in the OIA, when it was discovered that for several months after his return, from a detail at the IDB, he had not been reporting to any particular component of the Department and that OIA would be an appropriate match.... Unfortunately, from the beginning, he resisted the change ... In Lester v. Natsios, 290 F.Supp.2d 11, 29-30 (D.D.C.2003), the court recognized that changes in responsibility are not adverse actions but constitute “ordinary tribulations of the workplace” which employees should expect. See also Jones v. Billington, 12 F.Supp.2d 1, 13 (D.D.C.1997) (“not everything that makes an employee unhappy is an actionable adverse action”) aff'd without opn., 1998 WL 389101 (D.C.Cir.1998).
Def.’s Reply in Supp. of Mot. for Summ. J. 6-7.
The majority offers just over three pages worth of reasons explaining why HUD cannot possibly be understood to have said what it said. Maj. Op. at 608-10. First is the observation that HUD con *615 ceded that OGC kept Pardo-Kronemann’s time and attendance records upon his return to the agency. Maj. Op. at 609. This is true. It is also completely consistent with the conclusion that the “adverse action” baseline the agency advocated was what Pardo-Kronemann was doing on his return to the agency, when OGC was keeping his time and attendance records.
Next, the majority is troubled by the fact that in the passages of HUD’s district court filings that I’ve highlighted, the agency does not mention the handbook— which, in Pardo-Kronemann’s view, was his principal project in 2001. See Appellant’s Br. at 8-9; Maj. Op. at 610 (“Again saying nothing about the handbook ... ”); id. (“[W]e can find no argument in the quoted paragraph — or, for that matter, anywhere else in the reply brief — that the appropriate baseline consists solely of the IDB handbook.”). The reason is simply that the government’s papers made a stronger claim as to Pardo-Kronemann’s activities in the critical period, arguing that in 2001, he “was performing no work for OGC ... [or] for the Office of the Secretary,” see Def.’s Mem. in Supp. of Mot. for Summ. J. 7, J.A. 1465. But in evaluating a motion for summary judgment we take the facts in the light most favorable to the non-moving party. Obviously a neutral judge is hardly bound to a summary-judgment seeker’s rather aggressive reading of the conflicting materials. The point is that HUD looked to that period as a baseline for assessing adversity-
Finally, the majority observes that “HUD itself compared the OIA position to Pardo-Kronemann’s OGC work more generally.” Maj. Op. at 609-10. Assuming arguendo that this is true — and, moreover, that the phrase “OGC work more generally” should be construed to cover the work that Pardo-Kronemann did at OGC from 1998-1999 — it shows nothing more than that HUD was covering its bases. While the agency explicitly advocated use of the standard “adverse action” baseline (to wit, the employee’s job at the time of the supposed retaliation), it also made a variety of contingent arguments: even if the appropriate baseline were the job Pardo-Kronemann voluntarily abandoned two years before the putative adversity struck rather than the one he was doing when it happened, the new job still couldn’t be said to amount to a step down.
In fact, even if one made the further assumption that the agency didn’t frame its alternative arguments as such, but simply offered conflicting perspectives on the “baseline” issue, one still wouldn’t be able to reach the conclusion the majority adopts. In this scenario, the panel would need to choose for itself which of the two legal theories to follow, presumably on the basis of which was consistent with the law. In no case would the proper judicial response be to deliberately ignore one of the theories for no stated reason other than a fictional contention that no conflict existed between the parties.[1]
In reality, once we clear the alleged waiver out of the way, selection of the proper baseline for resolving whether the assignment was an adverse action seems quite straightforward. The question of the “adversity” required for an “action” to be retaliatory naturally depends on objective differences between the conditions before and after the change. See Burlington North. & Santa Fe Ry. Co. v. White, 548 *616 U.S. 53, 70, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (referring to “the former and present duties”); Czekalski v. Peters, 475 F.3d 360, 364-65 (D.C.Cir.2007).
It is fairly easy to rule out all of Pardo-Kronemann’s past positions other than his assignment at the time of the transfer to OIA.[2] His OGC job from 1998 to November 1999, which he left voluntarily, was one he had not occupied for over two years before the allegedly retaliatory action. See Pl.’s Statement of Material Facts in Dispute and Material Facts Omitted by Def. (“Plaintiffs Statement of Facts”) at 3, J.A. 1034 (asserting that HUD detailed Pardo-Kronemann to the Bank pursuant to a settlement agreement). And the Bank stint and the unpaid leave were clearly temporary arrangements.
Apart from HUD’s supposed waiver, the majority attempts to support its approach solely by citation to a Federal Circuit opinion, Hayes v. U.S. Postal Service, 390 F.3d 1373, 1377 (2004), which it quotes for the proposition that “an employee continues to be the incumbent of the position from which he was detailed.” Maj. Op. at 608. The quote from Hoyes is linguistically accurate, but the case has nothing to do with determining the baseline for evaluation of whether an action is adverse for purposes of Title VII retaliation. Hayes was a challenge by federal employees claiming that their assignments, following the elimination of their prior positions, violated civil service protections. The language the majority quotes is from the court’s quotation of a Merit System Protection Board decision on whether transfer to a temporary detail constituted a protection-triggering demotion. See 390 F.3d at 1377 (quoting Dixon v. United States Postal Serv., 64 M.S.P.R. 445, 450 (1994)). Dixon, the MSPB decision, had reasoned that a “detail by its very nature is temporary.” But, assuming it makes sense to extend civil service doctrine to Title VII, there are two fatal difficulties here. First, Pardo-Kronemann’s “detail” to the IDB had concluded in November 2000, and he had since been either on leave or in work for the Office of the Secretary that no party here characterizes as a “detail.” Second, even if Pardo-Kronemann’s activities in the international housing sphere from November 1999 through October 2001 could be classified as a “detail,” the quoted passages of civil service doctrine don’t address the status of a two-year “detail” into a new field, made explicitly at the employee’s request.
In the end, my colleagues offer no color-able answer to the question their approach begs: why would we ask. whether a transfer left an employee worse off not vis-a-vis where he was when it happened, but instead vis-á-vis a position he had long since departed at his own request? As far as I am aware, no case in this court or any other, published or unpublished, has ever framed its Title VII “adverse action” analysis as a function of the latter rather than the former inquiry.
*617 Once we select the standard baseline for determining whether an action is adverse, it is clear that there is no genuine issue of material fact whether Pardo-Kronemann can make out a prima facie case of retaliation.
The issue before the court should be whether a jury could reasonably find “material adversity,” see Burlington Northern, 548 U.S. at 68, 126 S.Ct. 2405 (emphasis in original), in Pardo-Kronemann’s transfer from the position he occupied upon his return to HUD in March 2001, to the position he occupied starting in January 2002. The ultimate inquiry, of course, is whether the challenged action “well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.” See id. (internal quotation marks omitted).
By his own account (i.e., in the light most favorable to him), Pardo-Kronemann spent the period from March until October 2001 doing three work-related tasks: finishing the handbook; drafting a memo about how HUD could be more effective in the international area; and discussing with another HUD employee a written history of OIA (a task that Pardo-Kronemann had been assigned but which he did not work on because the other employee claimed prior title to the project). See Appellant’s Br. at 8-9. During this time, he was technically part of HUD’s OGC, but was performing no assignments for that office. See id. at 8; Plaintiffs Statement of Facts at 4-5, J.A. 1035-36. While Pardo-Kronemann continued, through at least the early period after his return to HUD in March 2001, “to request [a] second year of ... detail,” this time at the Inter-American Investment Corporation, it was not until October 31, he says, that he requested “legal” work. Appellant’s Br. at 8-9. By that time, though, the allegedly retaliatory transfer was, in Pardo-Kronemann’s view, well underway; he claims it had been hatched as early as June of that year, Reply Br. at 24, and in any event no later than September, Appellant’s Br. at ll.[3]
Compared with his pre-existing slate of perks and responsibilities, Pardo-Kronemann’s job in HUD’s Office of International Affairs simply can’t be said to be a step down. The new position came with the same grade and pay, Plaintiffs Statement of Facts at 7, J.A. 1038, and left Pardo-Kronemann with the same formal title he had when he left OGC in 1999 and kept when he came back in 2001: AttorneyAdvisor, see J.A. 1515. The job description provided, among other things, that he was to “[cjonduct research of laws, legal opinions, policies, regulations, and related legal analyses of foreign governments and international organizations that serve to impede the development of market forces in housing and land development systems.” In other words, Pardo-Kronemann was charged with continuing precisely the type of work that he was performing when, he *618 says, the agency decided to retaliate against him by transferring him to a new department. The handbook regarding mortgage markets in developing nations (the main work of his old job) was surely a “comprehensive issue and research paper[ ] .... [regarding] legal developments affecting housing and urban policies abroad,” part of the work encompassed by the job description for his new job. See id. If the agency effected any substantive change from the status quo, it was a nominal expansion of the array of tasks Pardo-Kronemann was executing during his time back from the Bank; among his newly listed charges was “[p]rovid[ing] advisory services, as requested, on questions of law and interpretation of regulatory and administrative policy in foreign government and multilateral bodies” — a form of work quite distinct from the writing projects he carried out in 2001. See id.
Pardo-Kronemann has made a number of arguments why these straightforward conclusions are either wrong or at least too uncertain for summary judgment. None withstands scrutiny.
First is the contention that the transfer could reasonably be deemed adverse because the new job was not a “bona fide legal position.” Pl.’s Mem. in Opp. to Mot. for Summ. J. 6, J.A. 1006. The obvious flaw in this disparagement is that it is no more true of the new job than of the old. In the old job, Pardo-Kronemann reported to a policy advisor in the Secretary’s office, working on a paper about mortgage markets for eight months. In the new job, he reported to another person, also outside the General Counsel’s office, in a position designed for him to do virtually identical work. Regardless of whether that work is characterized as “legal” or not,[4] the inescapable conclusion is that the new job entailed no diminution of work responsibilities; they were the same, though potentially broader in the new position.
But, says Pardo-Kronemann, this is just an illusion. Even if the new job description provided for a suite of duties comparable to the ones he enjoyed before the transfer, the reality of the new position was different: it consisted of low-level research tasks, not on a par with his past handbook-drafting or the new job description. Recording of Oral Argument 6:38-6:53 (Feb. 4, 2010) (“[T]hey manufactured the position description ... and it had no connection to the reality of his assignments.... He was doing low-level research.”). The argument fails for two independent reasons. First, Pardo-Kronemann didn’t make it in his motion in opposition to summary judgment before the district court. He did offer the bare assertion that “the position description does not accurately describe Pardo-Kronemann’s duties,” Pl.’s Mem. in Opp. to Mot. for Summ. J. 7, J.A. 1007 — but that remark comes in the middle of a three-page discussion of why the new position relegated him to research rather than legal work. See id. at 5-8, J.A. 1005-1008. Not only is the allegation wholly unsupported by reference to any citation to the record, but in context, it can only be read to argue that the portions of the job description that require Pardo-Kronemann to provide “advisory services, as requested, on questions of law,” among similar tasks, are inconsistent with the work he was actually assigned. This gets him nowhere. He was not providing “advisory services ... on questions of law” before the transfer ei *619 ther, at least in the sense of advising line officials as to what conduct was lawful.
Second, the “untrue job description” argument fails because the record contains substantial evidence that the assignments Pardo-Kronemann actually executed were, in fact, undeniably comparable to his work on the handbook — and no material evidence that they weren’t. So, for example, his first task in the new position was to “analyze the Puerto Rican housing laws and regulations as a guide to Latin America.” Sorzano Dep. at 204 (Nov. 2, 2007), J.A. 1289. Another assignment was to work on the question, apparently fashionable in international policy circles, whether “there is [a] legal right to housing in the sense that the government has to provide [it] to every citizen.” Geraghty Dep. at 15 (Nov. 28, 2006), J.A. 1350. Neither the Sorzano testimony nor the Geraghty testimony is susceptible of the interpretation that there was a mismatch between Par-do-Kronemann’s job description and job performance such that any change in his work might be thought to represent “material adversity.” Nor does any other evidence change the calculus.
Pardo-Kronemann also argues that, principal duties aside, ancillary benefits of the new position were significantly different from those of the old. But he offers few illustrative examples, none the least bit telling. One is that in OGC he could travel to conferences to further his legal career, while he couldn’t in OIA. But again, whatever force the contention might theoretically have, Pardo-Kronemann himself conceded that, in fact, he didn’t travel for his previous work at HUD. See Pardo-Kronemann Dep. at 135 (June 30, 2006), J.A. 1510.
Another imaginable diminution of ancillary benefits might be that while Pardo-Kronemann performed the same work, he did so in a different department. Assuming arguendo that such a change might constitute “material adversity,” it simply isn’t the case that, in the relevant analysis, Pardo-Kronemann went from doing “nonlegal” work as a full-fledged part of the Office of General Counsel to doing such work someplace else. Instead, he went from doing a certain kind of work, reporting to a senior policy advisor in the Office of the Secretary, to doing work of the same kind, reporting to a more senior person in the Office of International Affairs.[5] See Def.’s Mem. in Supp. of Mot. for Summ. J. 8, J.A. 1466 (making the uncontroverted point that following his transfer, Pardo-Kronemann reported to a higher ranking supervisor than he had before).
A contrary view amounts to the position that it is aliuays a jury question whether a lateral transfer is an adverse action. After all, a department switch will always alter future paths to direct (rather than lateral) advancement. And yet even our farthest-reaching cases have refrained from adopting any such per se rule. See, e.g., Czekalski, 475 F.3d at 365 (“Whether a particular reassignment of duties constitutes an adverse action for purposes of Title VII is generally a jury question.” (emphasis added)); see also Baloch v. Kempthorne, 550 F.3d 1191, 1196 n. 1 (D.C.Cir.2008) (“Some courts of appeals have interpreted the adverse action requirement more narrowly than Czekalski.”). Thus we have multiple times affirmed summary judgments granted for want of an adverse action where an employer had shifted the plaintiff laterally after protected activity. See, e.g., Jones v. District of Columbia Dep’t of Corrections, 429 F.3d 276, 281 (D.C.Cir.2005); Brown v. Brody, 199 F.3d 446, 457 (D.C.Cir.1999); *620 Johnson v. Williams, 117 Fe.Appx. 769, 771-72 (D.C.Cir.2004) (unpublished); Sussman v. Powell, 64 Fed.Appx. 248, 249 (D.C.Cir.2003) (unpublished).
Yet another argument is that Pardo-Kronemann’s reassignment to International Affairs was adverse because he had an agreement with HUD to place him in a “mutually agreeable position” upon his return from the Bank, and that HUD breached that agreement by placing him somewhere he didn’t want to be. See Letter from Howard B. Glaser, Counselor to the Secretary, HUD, to Jose Pardo-Kronemann, July 21, 1999, at 1, J.A. 1492. Even if such an agreement had existed— notwithstanding the author’s proviso, two sentences after the “mutually agreeable” language, that “[t]his letter and our discussions are not a settlement or negotiation of any formal complaints you may have, but my attempt to help out an employee who is looking for a more challenging and satisfying work assignment” — it certainly didn’t grant to Pardo-Kronemann a perpetual veto over all future employment assignments. To the extent, then, that HUD had committed to allow Pardo-Kronemann to occupy a “mutually agreeable position” upon his return from his detail, the agency discharged that obligation by giving him eight months in which to finish the project he’d been working on for the Bank. And, of course, there is literally nothing in the record beyond Pardo-Kronemann’s conclusory assertions to suggest that the letter should be construed as an agreement at all. Nor is there any law suggesting that breach of a non-binding agreement with one who engaged in protected activity, standing alone, could ever qualify as adverse action.[6]
Finally, Pardo-Kronemann sees great significance in the fact that his boss at International Affairs, Ms. Sorzano, believed that in his new role, Pardo-Kronemann would not be “fully using [his] skills and legal education.” See Appellant’s Br. at 54; Pl.’s Mem. in Opp. to Mot. for Summ. J. 6, J.A. 1006. But this is analytically irrelevant to the “adverse action” inquiry. The question is whether Pardo-Kronemann was made worse off by the transfer compared with where he was before the transfer — not whether, after the transfer, he was using his legal skills to the fullest possible extent. As it happens, before the transfer he was doing work that was in a sense legal, and in a sense pure research. After the transfer, the same was true. Nothing Ms. Sorzano said could allow a reasonable jury to conclude otherwise.
We’ve previously noted, repeatedly, that The clear trend of authority ... is to hold that a purely lateral transfer ... that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A survey of the relevant case law shows that the authority requiring a clear showing of adversity in employee transfer decisions is both wide and deep.
Brown, 199 F.3d at 455-56 (citations and internal quotation marks omitted), quoted in haec verba in Jones, 429 F.3d at 281. There is no plausible, let alone genuine, issue of material fact whether Pardo-Kronemann’s transfer was a “demotion in form or substance” compared with the position he occupied upon his return to HUD from the Bank. Cf. Czekalski, 475 F.3d at 364-65. His numerous arguments to the contrary are smoke and mirrors.

. It is true, as the majority notes, that HUD’s brief on appeal doesn't offer a perspective one way or the other on the question of what the proper baseline for comparison is in the "adverse action” analysis. Neither, for that matter, does Pardo-Kronemann — an omission the majority does not hold against him.

. By "assignment” I do not, of course, mean a particular project on which Pardo-Kronemann was working upon his 2001 return to the agency, as the majority says I do. See Maj. Op. at 609 (“The dissent ... compares Pardo-Kronemann's new position at OIA not to his position at OGC, but to his pre-transfer, temporary work on the IDB handbook.”). I mean, obviously, the position he was occupying at that time. The majority's later statement that the "dissent concedes that HUD has failed to argue that the handbook is the relevant baseline,” Maj. Op. at 609, is very much in the spirit of "When did you stop beating your wife?” It builds in a premise that is disconnected from reality. No one involved in this case, including me, has ever suggested that the "handbook” was itself a job or an assignment in the relevant sense of being a position which Pardo-Kronemann ever held.

. Whatever the role (if any) of an employee's expressed aspirations in assessing the "adversity” of an action, Pardo-Kronemann’s October 31 expression of interest in garden-variety legal work cannot render his assignment to the Office of International Affairs — which was officially underway no later than October 15 — "adverse.” See E-mail from George Weidenfeller, Deputy General Counsel, HUD, to Sinthea Kelly et al. (Oct. 15, 2001), J.A. 45 (“[Pllease prepare papers to reassign Jose Pardo-Kronemann to the HUD International Affairs Office.”). The majority nevertheless sees something significant in the request. Maj. Op. at 608. To be clear, Pardo-Kronemann's claim in this case is that the agency retaliated against him. The action he says the agency took by way of retaliation was one the agency had determined to take before he revealed his renewed interest in conventional legal work; it escapes me how such an expression could render the prior event retaliatory.

. In fact, studying the development of primary and secondary mortgage markets appears to be not only very important work, see, e.g., Hernando de Soto, The Mystery of Capital: Why Capitalism Triumphs in the West and Fails Everywhere Else (2000), but also "legal” in many senses of the term.

. The transfer, moreover, hardly isolated him from the Office of General Counsel altogether. His first assignment in International Affairs actually originated from OGC. See Affidavit of Jose Pardo-Kronemann at 8 (Sept. 20, 2002), J.A. 1409.

. So far as appears, Pardo-Kronemann makes no claim for breach of contract, a cause of action that, if valid, would on his theory give him exactly he what he wants without the bother of proving retaliation.